1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9    SHARON SMITH,                    )    Case No. 1:07-cv-01288-TAG
                                      )
10              Plaintiff,            )    MEMORANDUM DECISION AND ORDER
                                      )    ON PLAINTIFF'S APPEAL FROM
11        vs.                         )    ADMINISTRATIVE DECISION
                                      )
12   MICHAEL J. ASTRUE,               )    ORDER DIRECTING CLERK TO ENTER
     Commissioner of Social Security, )    JUDGMENT IN FAVOR OF DEFENDANT
13                                    )    AND AGAINST PLAINTIFF
                Defendant.            )
14   _____)

15

16        Plaintiff Sharon Smith ("Claimant") seeks judicial review of an administrative decision of the

     Commissioner of Social Security ("Commissioner") denying her claims for disability insurance
17
     benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq*., and
18
     for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq*.
19
     (collectively, "disability benefits").  Claimant timely filed a complaint on September 4, 2007.  (Doc.
20
     2).  The matter has been fully briefed by the parties.[1]  (Docs. 16, 19, 20.)
21
          Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to proceed
22
     before a United States Magistrate Judge, and by order dated October 24, 2007 and docketed on
23
     October 25,  2007, this action was assigned to the United States Magistrate Judge for all further
24
     proceedings.  (Doc. 11).
25

26   _____

          [1]Claimant filed an opening brief and a reply brief.  (Docs. 16, 20).  Defendant's response is titled as a
27   cross-motion for summary judgment.  (Doc. 19).  Although briefs in Social Security cases previously were deemed
     summary judgment motions, for several years this Court has termed the documents as "opening briefs," "responses,"
28   or "oppositions" and "reply briefs."  This memorandum decision and order continues that trend.

                                              1

## PROCEDURAL HISTORY

Claimant's applications for disability insurance benefits and supplemental security income were filed on December 6, 2001. (Administrative Record ("AR") 123, 435). In those applications, claimant alleged a disability onset date of November 11, 2001, and initially described her disabling condition as sciatic nerve damage, lower back pain, and left leg numbness. The Commissioner initially denied both applications on June 10, 2002.[2] (AR 38). Claimant requested reconsideration of that denial on July 18, 2002. The request for reconsideration was denied on September 12, 2002, whereupon Claimant requested a hearing before an administrative law judge ("ALJ"). (AR 42, 43, 48). After a series of noticed and postponed hearings spanning a period of over three years, this matter was heard on July 20, 2006 by ALJ Bert Hoffman. (AR 448-447). Claimant appeared at the hearing, was represented by an attorney, and provided testimony.

On January 25, 2007, the ALJ issued his written findings and orders in this matter. (AR 15-23). The ALJ determined that Claimant was not disabled under Act. On January 30, 2007, Claimant asked the Appeals Council to review the ALJ's decision. (AR 11). On July 12, 2007, the Appeals Council denied Claimant's request for review, and the ALJ's decision became the Commissioner's final decision in the matter. Claimant then brought this action for judicial review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision to deny benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision (made through the ALJ) when the determination is not based on legal error and is supported by substantial evidence. See *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U.S.C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v.*

---

[2] The denial letter indicated Claimant's alleged disabilities as back pain and depression.

2

*Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan,* 888 F.2d 559, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988.) Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (citations omitted). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not the court, to resolve conflicts in the evidence. *Richardson*, 402 U.S. at p. 400. If the evidence supports more than one rational interpretation, one of which supports the Commissioner's decision, that decision must be upheld. *Allen V. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or non-disability, the finding of the Commissioner is conclusive, unless an improper standard was applied in weighing the evidence and making the decision. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987); *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## RELEVANT LEGAL AND REGULATORY FRAMEWORK

For purposes of Title II and Title XVI of the Act, the person seeking disability benefits must demonstrate that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A), 42 U.S.C. § 1382c(a)(3)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

3

To be eligible for disability insurance benefits, a worker must, among other things, be insured for disability purposes and be disabled on that date. 42 U.S.C. § 416(i). Title 20 C.F.R. § 404.101(a) provides, in pertinent part, that an applicant's "insured status" is a basic factor in determining if someone is entitled to disability insurance benefits and that, if the person seeking those benefits is neither fully nor currently insured, no benefits are payable.

The Commissioner uses a five-step sequential evaluation process for determining whether a person is disabled under Titles II and/or XVI of the Act. 20 C.F.R. §§ 404.1520(a), 416.920(a). Step one determines whether the claimant is engaged in substantial gainful activities. (20 C.F.R. §§ 404.1520(b), 416.920(b).) If he is, benefits are denied. If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. (20 C.F.R. §§ 404.1520(c), 416.920(c).) If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, the claimant is conclusively presumed to be disabled. (20 C.F.R. §§ 404.1509, 416.909.) If the impairment does not, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past. (20 C.F.R. §§ 404.1520(f), 416.920(f).) If the claimant is able to perform his previous work, he is not disabled. If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience. *See Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287 (1987).

The initial burden of proof rests upon a claimant to establish that he "is entitled to the benefits claimed under the Act." *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted). In terms of the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of

4

burdens" such that "the ALJ shares the burden at each step." *Tackett v. Apfel*, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999) (italics in original). The initial burden is met once a claimant establishes that a physical or mental impairment prevents him from engaging in his previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

Here, the ALJ determined that Claimant met the insured status requirements of the Act through December 31, 2010. The ALJ also found that Claimant had not engaged in any substantial gainful activity since November 11, 2001, the alleged onset date; that Claimant had a severe combination of impairments involving deformity of the left fourth and fifth fingers or contracture, as well as a psychotic disorder, not otherwise specified; that Claimant's psychotic symptoms had a mild degree of limitation on her ability to engage in daily living activities and to interact with others but that her mental impairment limited her ability to maintain concentration, persistence, and pace; that Claimant's back condition and related symptoms have not been shown to have more than a minimal effect on claimant's functional abilities; that Claimant's combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 22). The ALJ also found that Claimant had the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, to stand and/or walk six hours in a workday, to sit unrestricted, but was limited to performing simple, repetitive tasks (i.e., Claimant could perform at a medium level of exertion limited to simple, repetitive tasks); and that the Claimant was unable to perform any past relevant work. After considering Claimant's age, education, work experience, and residual functional capacity, the ALJ concluded that Claimant was not disabled because there were jobs in the national economy that she could perform. (AR 22).

### ISSUES

In her Opening Brief, Claimant asserts two errors – first, the ALJ failed to provide clear and convincing reasons to reject the opinion of Dr. S. Ghaemian, the psychiatric consultant who had most recently examined Claimant, and, second, the ALJ erred in using the Medical-Vocational Guidelines to determine whether Claimant, in light of her residual functional capacity and her

inability to perform past relevant work, could engage in other types of substantial gainful activity that existed in the national economy.

## STATEMENT OF FACTS

The facts have been presented in the administrative hearing transcript, the ALJ's decision, and the briefs filed by Claimant and the Commissioner. Only those facts relevant to the issues before this Court for decision will be addressed at any length here.

Over the course of this adjudication, Claimant's allegedly disabling conditions have come to be identified, primarily, as back related conditions, pain, numbness in her left leg, anxiety, depression with psychotic features, and deformities in the fourth and fifth fingers of her left hand. Claimant was 45 years old on November 11, 2001, the date she claimed her disability began. (AR 123). She completed a high school education in regular classes. (AR 452). Claimant spoke, read, and wrote in English. (*Id.*) Claimant was right-handed. (AR 453). She worked as an adult in the restaurant industry as a waitress for approximately six years and as an in-home support services provider from 2001 through the date of the administrative hearing, except for a period of time when she was incarcerated. (AR 158, 453-455.) At the time of the hearing, Claimant provided about 40 hours of in-home supportive services to one client, three days a week, six hours a day. (AR 454, 455). Claimant vacuumed, dusted, did laundry, ironed and shopped for the client's groceries each week. (*Id.*) Claimant had an allotment from the county to work as many as 105 hours each month as an in-home services provider but did not work all her allotted hours each month. (AR 455).

Claimant had a driver's license and drove a Saturn station wagon. (AR 452, 469). She shared her home with her live-in boyfriend of four to five years; attended church services with him; went out to dinner with her boyfriend occasionally and spent some of their evenings together at home watching movies. (AR 464, 465). Claimant has two adult children with whom she maintained some regular contact. (AR 465-466). She took care of her grandchildren at their home(s) at night, once or twice a week, including some overnight periods. (AR 466, 467). Claimant usually attended church services on Thursdays and Sundays, was active in her church, was able to drive, and had a car available to her. (AR 452, 469-470).

///

*Psychiatric Medical Source Statements of Consulting Examiners.*

At issue here are the opinions of only two physicians, both psychiatric consultants who directly assessed the impacts of Claimant's mental health condition on her functional abilities. The opinions of those two medical sources are the only evidence argued by the parties here.

Both are consultants who examined Claimant in the course of rendering their opinions. Dr. Shohreh Ghaemian opined that the functional limitations imposed by Claimant's mental impairments were more substantial and restrictive than those identified by Dr. Shailesh Patel. The ALJ reached essentially the same conclusion as Dr. Patel; in making a finding as to the severity of Claimant's impairments at step two of the sequential evaluation process, the ALJ found, among other things, that Claimant's psychotic symptoms had a mild degree of limitation upon Claimant's ability to engage in daily living activities and in her ability to interact with others, but moderately limited her ability to maintain concentration, persistence, or pace. (AR 18). Claimant argues that the ALJ's conclusion was the result of the improper application of an incorrect legal standard and was therefore error requiring reversal. The Commissioner disagrees.

Dr. Shailesh C. Patel, a Board Certified psychiatrist, examined Claimant on March 19, 2002. (AR 210-213). At that time, Claimant was casually dressed, had good hygiene, with normal posture, gait, and general motor behavior. (AR 210). Claimant's chief complaint was "feeling depressed all the time." (*Id.*) She reported talking to herself and being unaware of that fact. (*Id.*) Her depression had been present for the past year and she reported that it was getting worse. (*Id.*) Claimant had been taking Wellbutrin and Paxil to manage her symptoms for the preceding six months and reported improvement with the medication. (*Id.*)

After observing Claimant and conducting what appears to be a thorough and detailed interview with Claimant addressing all the areas usually involved in assessing a claimant's mental health condition and severity, Dr. Patel's mental status examination indicated the following:

> Appearance and Behavior: [Claimant] was cooperative during the interview. Her speech was normal. She has no psychomotor agitation or retardation. Her eye contact was good. Her speech was normal.

> Thought Content: No delusions or obsession. She denied suicidal or homicidal ideation.

<u>Thought Process</u>: Coherent.

<u>Affect and [M]ood</u>: She was tearful.  She complained feeling [sic] depressed.

<u>Perceptual Abnormality</u>: She did not look internally preoccupied. She denied any history of command hallucination.

<u>Sensorium and Cognition</u>: She was alert and oriented to all spheres.  She was able to register 3 words out of 3 and was able to recall 1 word after 5 minutes.  She was able to spell "table" backward and forward. She registered given phone number.  When asked about current and past presidents she said "I don't know."  When asked about recent news events she said terrorist activity [sic] and bad news.  She was able to do similarity and difference.

<u>Insight and Judgment</u>: Her insight and judgment are good.

Prognosis: Her prognosis is good.  (AR 211-212).

Dr. Patel diagnosed Claimant with a depressive disorder not otherwise specified and a history of amphetamine abuse, reportedly in remission.  (AR 212).  Dr. Patel assigned Claimant a current GAF score of 60.  (*Id.*)  As for claimant's level of functioning, Dr. Patel stated that claimant reported "feeling depressed and hearing voices.  She did not look internally preoccupied during the interview. There [is] minimal evidence suggesting her depression [is] affecting her ability to work.  She should receive vocational training if needed."  (*Id.*)

In the medical source statement accompanying Dr. Patel's report, Dr. Patel opined that claimant had a good ability to relate and interact with supervisors and co-workers; her ability to understand, remember, and carry out an extensive array of technical and/or complex job instructions was fair but her ability to understand, remember, and carry out simple one or two step job instructions was good; claimant's ability to maintain concentration and attention for at least two hour increments was fair but her ability to deal with the public, withstand the stress and pressures associated with and eight-hour work day and day-to-day work activity were all assessed by Dr. Patel to be good.  (AR 213).

Another consultative psychiatric examination of claimant was conducted by Dr. Shohreh Ghaemian, a Board Eligible psychiatrist, on September 16, 2006.  (AR 427-434).  In conducting this examination of Claimant, Dr. Ghaemian apparently had no prior psychiatric reports or other potentially relevant medical records.  (AR 427).

According to Dr. Ghaemian, Claimant arrived at the office for her appointment unkempt, disheveled, and dirty. Claimant was cooperative and fully oriented. (AR 427). Dr. Ghaemian recorded Claimant's chief complaints to be anxiety and pain in her finger. (*Id.*)

Like Dr. Patel, Dr. Ghaemian also appears to have conducted a thorough and detailed interview of the Claimant. Dr. Ghaemian described Claimant as a "limited historian" or a "very limited historian" for purposes of the examination at three different points in the report. (AR 427, 429). Claimant reported that her disability requests were denied because she was "not taking medications" and said that her failure to take the prescribed medication was due to her inability to afford it financially. (AR 427). Claimant had two bottles of Risperdal and Celexa on the date of the examination, which she received on August 18, 2006, approximately one month earlier.[3] (*Id.*) There was one pill left in each bottle at that time. (*Id.*) Claimant reported that she was taking the medication for "voices and depression." (*Id.*)

Claimant also reported a history of child abuse at the hands of her parents; a mental illness history in both parents and in her siblings; former domestic abuse by her boyfriend; nightmares; flashbacks of abuse; anxiety causing her to isolate; panic attacks; and auditory hallucinations which began about eight years before; that she is depressed and sleeps s a lot; that she has no current thoughts of homicide or suicide; that she has some racing thoughts but no visual hallucinations and no thought broadcasting. (AR 428). Claimant reported that she "thinks people can put thoughts in her head." (*Id.*) Claimant also denied any current drug or alcohol abuse and reported that she last used methamphetamine four years earlier. (*Id.*) Claimant also reported that she was then using marijuana occasionally at night to relax and induce sleep. (AR 429).

After addressing all the areas usually involved in assessing a claimant's mental health condition and severity, Dr. Ghaemian's mental status examination indicated the following:

> General Appearance: [Claimant] is disheveled, dirty, and inattentive to her appearance. She is missing her front teeth. ... She is able to engage and have appropriate eye contact.

> Attitude and Behavior: [She] had a positive attitude toward the interview.

---

[3] The medication was prescribed by a Dr. Shand Huo. Claimant "was not able to name" the facility from which she got this medication. (AR 428).

Behavior was cooperative. She is a limited historian.

Stream of Mental Activity and Speech: [C]laimant's thought process was tight, logical, and goal oriented. Speech was normal rate and pace with relevant content.

Content of Thought: Claimant denies psychosis or thoughts of suicide or homicide. She admits to auditory hallucinations and some delusions of thought insertion were elicited.

Mood/Affect: Stated mood was depresses. Affect appeared restricted.

Intellectual Functioning and Sensorium/Orientation: Claimant was fully oriented to September 2006.

Memory: *Immediate* ... appeared to be intact. *Recent* appeared to be impaired. Her immediate recall of three objects was 3/3 and her recall of three objects in five minutes was 2/3. *Past*: Intact. She was able to recall her home phone number, address, and name the current President.

Fund of Knowledge/Information: Below average.

Calculation: [S]he was unable to perform serial 7s. She was able to add.

Concentration: [S]he was able to spell "world" forward as "would" and backwards as "would." She was able to perform three-step commands with no difficulty.

Abstract Thinking: Abstract thinking appeared to be concrete ....

Similarities and Differences: Claimant stated an apple and an orange are similar in that they are both fruit but different in their skin colors.

Insight and Judgment: Fair. She stated she would call 9-1-1 if she saw a fire.

Current Level of Functioning: [S]he stated that she was able to take care of her personal hygiene. She cooks, cleans, and does the laundry at home. She lives with her boyfriend. She stated that she mostly wants to sleep at home and does not do anything.

Concentration/Persistence/Pace: Appear to be normal. (AR 428-430).

Dr. Ghaemian's Axis I diagnoses of claimant included "chronic post-traumatic stress disorder; amphetamine dependence in late, full, sustained remission, strictly per the claimant's report; cannabis dependence in active phase; psychotic disorder not otherwise specified (rule out substance induced persistent mood disorder/psychosis); and panic disorder with agoraphobia." (AR 430). Dr. Ghaemian assigned Claimant a GAF score of 53 without specifying whether the score is current or past. (*Id.*) Under "Discussion and Prognosis," Dr. Ghaemian reported that the "claimant presented

with extensive history of substance dependency, prominent post traumatic stress disorder symptoms, presence of psychosis. She reports taking medication. The duration of her treatment is not clear. The claimant's condition is chronic and complex. Prognosis appears guarded at this time." (*Id.*)

In a "Medical Source Statement," Dr. Ghaemian noted that "claimant state[d] that she had started taking medications recently. However, the duration of her treatment was not clear. Whether the psychosis was permanent or mainly substance related was not clear." (AR 431). Dr. Ghaemian described Claimant's reports of "prominent symptoms of post traumatic stress disorder, intrusive thoughts, and flashbacks" could "interfere with her ability to concentrate, continue to repeat, and respond to instructions from the supervisor. Her ability to interact with colleagues and the public appear[ed] to be limited due to her agoraphobia and panic symptoms. She [would not be] able to handle stressors. [She might] be able to perform routine work on a limited basis." (*Id.*) Dr. Ghaemian also ended the written portion of the assessment with the following caveat: "Random assessment of urine toxicology to clarify any ongoing substance dependency, except for cannabis, which is clearly reported by the claimant, is strongly recommended. Re-evaluation of this claimant following an extended period of complete and total sobriety is also recommended as well." (*Id.*)

In Dr. Ghaemian's accompanying "Medical Source Statement of Ability to Do Work-Related Activities," he opined that Claimant's mental health impairment would impose no limitations on her ability to understand and remember short, simple instructions and understand and carry out short, simple instructions. (AR 432). However, with respect to understanding, remembering, and/or carrying out detailed instructions, he concluded that Claimant's ability was moderately limited as the result of her mental impairments. (*Id.*) Dr. Ghaemian further opined that those impairments moderately affected Claimant's ability to make judgments in the context of something to do with simple work-related decisions.[4] (*Id.*) In support of these opinions, Dr. Ghaemian relied upon her/his clinical findings of intrusive flashbacks, as well as the panic and other symptoms of anxiety Claimant reportedly experienced. (*Id.*) Similarly, Dr. Ghaemian found that Claimant's anxiety symptoms and ongoing psychosis moderately to markedly impaired Claimant's ability to interact

---

[4] The preposition linking "judgments" with "simple work-related decisions" is not legible in the Court's copy of the administrative record. (AR 432). However, the ambiguity appears to be of no import.

appropriately with the public and her co-workers; moderately impaired Claimant's ability to interact with supervisors; markedly impaired Claimant's ability to respond appropriately to changes in a routine setting; and markedly to extremely impaired Claimant's ability to respond appropriately to work pressures in a usual work setting. (AR 433). Dr. Ghaemian also noted that Claimant's reported use of marijuana did not appear to contribute to Claimant's current symptoms. (*Id.*)

## DISCUSSION

1. The ALJ's Evaluation of Dr. Ghaemian's Opinion

   A. Claimant's Arguments

   Claimant argues that the ALJ committed legal error in his treatment of these two medical opinions. More specifically, Claimant insists that clear and convincing reasons, supported by substantial evidence in the record, were required in order to reject the opinion of Dr. Ghaemian and those reasons were not provided. Claimant's argument is premised on the assumption that the earlier opinion of Dr. Shaliesh Patel was too remote in time to be relevant and, therefore, effectively, of no proper use to the ALJ in reaching a decision.[5] The broader impact of this argument, were it correct, would be that the only opinion entitled to consideration was that of Dr. Ghaemian. It was, according to Claimant's argument, essentially uncontradicted and, as such, could not be rejected except for clear and convincing reasons supported by substantial evidence in the record.

   Claimant argues, alternatively, that, while the two opinions, both relevant, could properly be considered by the ALJ in arriving at a conclusion, in order to reject Dr. Ghaemian's opinion, the ALJ was still required to set forth specific and legitimate reasons for doing so, based on substantial evidence in the record. Claimant insists that the ALJ failed in this regard because he did not provide legitimate reasons for rejecting Dr. Ghaemian's assessment. More specifically, claimant finds fault with the ALJ's finding that Claimant's work history as an in-home services provider demonstrated Claimant was capable of work activity on a sustained basis; it did not properly account for the "fact" that Claimant was capable of only working eighteen hours per weeks and, even then, only with the

///

---

[5] This argument also fails to account for the apparent nuances in the ALJ's approach. It appears to this Court that ALJ Hoffman accepted Dr. Ghaemian's opinion in part and rejected it in part.

accommodations made for Claimant's impairment by the claimant's client.  (Appellant's Opening Brief ("AOB") at pp.7-9.)

B.    Analysis

(1)    Psychiatric Medical Source Opinions

The Court begins its analysis with settled law.

> Our sole inquiry is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the law judge.  Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld.  In reaching his findings, the law judge is entitled to draw inferences logically flowing from the evidence.  The ALJ need not substitute the judgment of expert witnesses for his own. 20 C.F.R. § 404.1526-27; *cf., Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (reason for rejection must be offered where such testimony is uncontroverted).  Where ... medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the [ALJ].  (Internal quotations and most citations omitted.)  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

Although resolutions of conflicts, ambiguity, and credibility are the province of the ALJ, the process is guided by certain principles.  In the Ninth Circuit, the opinions of those physicians who are involved in providing opinion evidence in disability determinations are analyzed according to the various relationships they have had with the claimants: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians).  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).

> As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions.  Even if the treating doctor's opinion is contradicted by another doctor, the [ALJ] may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.
>
> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician.  As is the case with the opinion of a treating physician, the [ALJ] must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. (Citations and footnotes omitted.)
*Lester*, 81 F.3d at p. 830.

As mentioned earlier, both psychiatrists examined Claimant but neither treated her. There is a conflict between the two psychiatrists's opinions, at least in part, with respect to the functional impacts of Claimant's mental status on her work-related abilities.

Contrary to Claimant's argument, the earlier opinion of Dr. Patel was properly considered by the ALJ, along with that of Dr. Ghaemian, in reaching a conclusion about Claimant's residual functional capacity. In this case, the medical source opinion provided by Dr. Patel in March, 2002 was not irrelevant to the issues before the ALJ. Dr. Patel's opinion was not too remote either in time or circumstance to be of no significant value to the ALJ. Here, Claimant had alleged an onset date of disability beginning in mid-November of 2001 which disability was alleged to be the result of physical and mental impairments. The date of onset and the duration of disability were issues the ALJ had to decide as part of his disability determination. Moreover, the medical assessment and the opinion of Dr. Patel provided a baseline measurement by which changes over time could be measured and evaluated. The factual underpinnings of Dr. Patel's opinion were important metrics in the shifting presentations of the clinical picture claimant presented during the five-plus year period of adjudication.

Far from being too remote in time, the earlier opinion by Dr. Patel served as a vital clinical starting point for understanding Claimant's mental status and condition at the time she claimed her symptoms first emerged. This earlier information permitted the ALJ to analyze and evaluate later assessments of the claimant's mental health condition, and any resulting functional impairments, with more competence and confidence, given this more complete longitudinal record. Consequently, it would appear that both the opinions of these consulting psychiatric examiners were properly scrutinized by the ALJ and, to the extent there was significant conflict between them, the rules regarding clear and convincing reasons for discounting or rejecting the opinion of one over the other do not apply. Instead, the controlling principle mandates the use of the specific and legitimate reasons standard in this case.

///

14

The ALJ can satisfy the mandate of providing specific and legitimate reasons, supported by substantial evidence in the record, by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. The ALJ must set forth his own interpretations and explain why they, rather than the conflicting opinion of the examining doctor, are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th Cir.1988).

In this case, the ALJ set forth specific and legitimate reasons, based on substantial evidence in the record, to support his conclusion that Dr. Ghaemian's assessment was of little value in reaching some conclusions about claimant's residual functional capacities. Having found that Claimant had the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; to stand and/or walk for six hours in a workday; to sit unrestricted; and could perform simple repetitive tasks (AR 18), the ALJ gave no weight to the portion of Dr. Ghaemian's opinion that concluded (1) claimant had limited ability to interact appropriately with others in workplace settings and (2) claimant was unable to handle stressors associated with the workplace over the course of an eight-hour workday (AR 21). The ALJ reasoned that Dr. Ghaemian's assessment was directly contradicted by the following facts: Claimant had been able to maintain part-time employment as an in-home service provider for five years, up to and including the date of Dr. Ghaemian's consultative examination, earning approximately $600 a month for part-time work; this accomplishment, according to the ALJ, indicated Claimant was capable of performing work activity on a sustained basis (AR 20); in addition to her part-time work schedule, Claimant was able to, and did maintain personal and familial relationships over sustained periods with her boyfriend, her friends, her grandchildren, and members of the church Claimant regularly attended (AR 20-21); and Claimant participated in recreational or social activities including twice weekly church attendance, regular participation in other church functions, caring for her grandchildren on an overnight basis, and visiting with friends, including periodic fishing trips to a local lake (AR 21). Furthermore, the ALJ pointed to Claimant's satisfactory performance of basic activities of daily living over a significant number of years, much of the time on her own because her boyfriend's work took him out of town three to four nights each week. (*Id*.) The ALJ observed that Claimant has been

able to perform with relative success in these diverse areas of functioning with, and more recently, without psychotropic medication or mental health counseling. (*Id*.)

The ALJ did not reach his conclusions regarding Claimant's residual functional capacities without reference to supporting medical source statements. He gave Dr. Patel's 2002 opinion great weight in assessing Claimant's residual mental functional capacities, an opinion which conflicted in significant ways with that of Dr. Ghaemian. (AR 20). The ALJ's reliance on the earlier opinion was explained carefully and based on substantial evidence in the record. In crediting Dr. Patel's opinion, the ALJ noted that Dr. Patel was a Board Certified psychiatrist (*id*.) who "conducted a thorough lengthy evaluation of [the] claimant, ... provided a lengthy report of the findings, which [were] consistent with claimant's ability to engage in work activity on a daily basis for the past five years[,] combined with [claimant's] other daily living activities and lack of prescribed treatment since March 2004." (*Id*.)

The ALJ exhaustively reviewed substantial evidence in the record which supported the ALJ's conclusions. According to the ALJ's decision, Claimant had no reported history of psychiatric hospitalizations. (AR 20). Claimant told Dr. Patel that her depression had improved as a result of taking the prescribed medications. (*Id*.) In August of 2002, Claimant reported she no longer heard voices and in September of that same year, Claimant's depressive/psychotic features were noted to be well controlled. (*Id*.) Similarly, clinic notes from April 15, 2003 also show that Claimant's psychosis was under control. (*Id*.)

The ALJ noted that, despite reports of depression and auditory hallucinations, Claimant presented herself reasonably well at the psychiatric evaluation Dr. Patel conducted. Claimant was oriented to time, place, and person. (*Id*.) She was cooperative, with normal speech, good eye contact, no physical agitation or retardation in her movements, coherent and with intact thought content (*id*.). Dr. Patel concluded, and the ALJ noted, that Claimant's insight and judgment were good. In Dr. Patel's opinion, based on Dr. Patel's own findings, Claimant's depressive symptoms would not affect her ability to work; that Claimant had the ability to understand, remember, and carry out simple instructions; could understand, remember, and carry out simple one-to-two step instructions; could interact and relate to her supervisors and co-workers; and had the ability to deal

with the public appropriately. (*Id*.) The ALJ considered this persuasive. (*Id.*)

In his efforts to reach an accurate and reliable conclusion as to the functional impacts of Claimant's mental health impairments, the ALJ also considered significant the extent to which Claimant functioned satisfactorily in the fields of work and social relationships for a continuous number of years, based upon the information before him. (AR 20-22). Many of these are described above. Despite Claimant's impairments and subjective complaints, she had worked without apparent interruption in in-home services as a housekeeper on a part-time basis since 2001 through the date of the decision. (AR 18, 22). For that part-time work, Claimant earned approximately $600 per month.

As for social functioning, Claimant's current activities of daily living (based on testimony provided by Claimant at the July, 2006 hearing) provided considerable insight into her levels of success. Claimant reported going out to dinner with her boyfriend, with whom she shared a home; attending church services (either with or without her boyfriend) twice each week and participating in other church functions; watching movies at home for entertainment; caring for her grandchildren overnight while the children slept, apparently on her own, and several times each week; visiting with friends occasionally; and going fishing from time to time.

The ALJ also considered other aspects of Claimant's circumstances. He noted that "claimant has taken the same medication for pain and her mental health issues at least for the past two to five years." (AR 21). The ALJ reasonably inferred that Claimant must have experienced some improvement in symptomatology as a result of these medications; otherwise, logic would suggest the initiation of a change in dosage, prescription, or treatment. (*Id.*) This was not an unreasonable inference on the ALJ's part. Claimant's failure to seek treatment for her mental health issues from a mental health care specialist, despite having been referred to those resources in 2002, 2003, and 2004 (and at times when Claimant was covered by government subsidized health care insurance – *see* AR 353-354, 380-381, 384), was another factor the ALJ considered in determining Claimant's residual functional capacity. (AR 21). Similarly, the several year gap (spring, 2004 to sometime after the July, 2007 administrative hearing) in treatment history suggested to the ALJ that Claimant's subjective complaints may not have been as severe as Claimant reported. (*Id.*)

///

17

(2)     Claimant's Accommodation Argument

Claimant additionally contends that the ALJ's conclusion was fatally flawed because he failed to account for the accommodations Claimant's client/employer allegedly made for Claimant's mental impairments.  Claimant argues that in the absence of such an accounting, the ALJ's reliance on Claimant's ability to perform part-time work on a sustained basis was not a legitimate reason for discounting or dismissing  Dr. Ghaemian's opinion.  This argument misses the mark for a number of reasons.

First of all, there is nothing in this record that demonstrates the ALJ found Claimant had a severe physical impairment that interfered with her ability to perform housekeeping services.  More critically, Claimant has cited this Court to none.  The only physical impairment the ALJ found to be more than minimal, in terms of effect, was a manipulative limitation in the fourth and fifth fingers of Claimant's left hand, an impairment that impacted Claimant's fingering movement in that hand to some degree.  (AR 18, 20).  Claimant is right-handed.  (AR 453).  There is no evidence in the record that Claimant's ability to iron, vacuum, shop, drive, or do laundry was compromised by this one limitation.  Moreover, Claimant had the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; to stand and/or walk for six hours in a workday; to sit unrestricted; and was limited to performing simple repetitive tasks. (AR 18).

Second, the Court has found no evidence in this record, and Claimant cites to none, that Claimant's client/employer made any actual and/or significant accommodations for Claimant's alleged impairments, mental or physical.  Claimant argues that the woman for whom she worked would "bend the rules for her."  (AR 454).  As far as the record demonstrates, such "accommodation" or "rule bending" – if it existed at all – *at most* involved "letting [claimant] sit down while ironing" (AR 454) or when bending allegedly caused Claimant back pain (AR 464).  Common sense dictates that sitting down while ironing is hardly an "accommodation."  As for Claimant's alleged back pain, the ALJ concluded that her back-related impairments were "nonsevere ... and [had no] more than a minimal effect upon the claimant's ability to function."  (AR 18).  Consequently, if any such "accommodation" for a physical condition did occur, the ALJ's finding indicates that Claimant's condition would not have required it.  Similarly, with respect to any

accommodations made necessary by Claimant's mental impairments, Claimant does not cite this Court to anything in the record showing that Claimant was permitted by her in-home services client/employer to lie down while on the job, take other unscheduled or frequent breaks, alter the routine of schedules, or make any other accommodations based on Claimant's mental impairments.

Third, Claimant asserts that her failure to fully utilize the county's allotment of hours each month was due to the impairments resulting from her various physical and mental conditions and she testified to this at the hearing. The Court understands Claimant's argument to be that this "underutilization" is a kind of *de facto* evidence of self-directed accommodation. The Court disagrees Claimant's characterization of her testimony on this point. While Claimant testified that she has panic attacks that she "can't handle" (AR 458), there is no testimony or other documentary evidence that ties her panic attacks, depressive symptoms, auditory hallucinations, or any physical impairment to her failure to fully utilize the county's monthly allotment of service hours as an in-home provider. (AR 454-455).

For all these reasons, the Court concludes that the ALJ did not err in his application of the guidelines described in Section 12[6] of 20 C.F.R. Part 404, Subpart P, Appendix 1, which assist the ALJ in reaching reliable and accurate assessments of disability based on mental impairments. More broadly, and based on the fuller discussion set out above, the Court concludes that the ALJ properly evaluated the conflicting medical evidence concerning the functional impacts of Claimant's mental impairment, and correctly applied the controlling legal principles to what is substantial evidence in the record.

---

[6] Claimant appears to have cobbled together parts of Section 12C and 12E. Her first citation to 20 C.F.R. Part 404, Subpart P, § 12, which begins on page 8 of her Opening Brief and concludes on page 9, is taken from §12C.3. That subparagraph speaks to issues of "concentration, persistence, or pace." Dr. Ghaemian's opinion concluded that claimant's concentration, persistence, and pace appeared to be adequate. (AR 430.) Claimant's second citation at AOB page 10 is taken from Section 12E which addresses "chronic mental impairments." There is some mention in that subparagraph of accommodations to living a claimant makes in order to minimize stress and reduce signs and symptoms. This may be the "linchpin" of the argument claimant makes here. Quite frankly, however, the contours of claimant's argument on this point are less than precise and sometimes difficult to understand. To the extent that we have understood her argument correctly, it is not persuasive for the reasons discussed. And it was an issue that was hers to prove. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir.1984). On the other hand, if we have failed to grasp the argument claimant makes, then the argument is insufficient for purposes of decision here. "We review only issues which are argued specifically and distinctly in a party's opening brief." *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir.1994).

1    2.        Propriety of Using the Grids Instead of a Vocational Expert

2              A.        Claimant's Argument

3         Claimant contends that the ALJ erred in his application of the Medical-Vocational

4    Guidelines ("the Grids").  She claims that her significant non-exertional limitations precluded

5    application of the Grids in determining whether Claimant could perform a significant number of

6    other jobs in the national economy.

7              B.        Analysis

8         Ordinarily, the Court does not consider matters on appeal that are not specifically and

9    distinctly argued in the appellant's opening brief.  *Carmickle v. Commissioner*, 533 F.3d 1155, 1161

10   (9th Cir. 2008).  Nevertheless, the Court will address the issue raised by Claimant,  i.e., the

11   contention that the ALJ erred in failing to obtain the opinion of a vocational expert in arriving at the

12   conclusions mandated by Step 5 of the sequential evaluation process.  The Court understands

13   Claimant to argue that her left finger impairments imposed significant non-exertional limitations that

14   precluded application of the Medical-Vocational Guidelines in determining whether claimant, given

15   her age, education, work experience, and residual functional capacity, could engage in other types of

16   substantial gainful work that exists in the national economy. (AOB at p. 10; Appellant's Reply Brief

17   ("ARB") at p. 11.)

18        Not every case in which a claimant's functional capacity is limited by a non-exertional

19   impairment requires the use of a vocational expert; the guidelines cannot be used in place of a

20   vocational expert or specialist only in those situations where the non-exertional impairment is

21   sufficiently severe so as to limit the claimant's functional capacity in ways not contemplated by the

22   guidelines.  *Desrosiers*, 846 F.2d at p. 577.  In assessing whether use of the guidelines in lieu of

23   vocational expertise, the ALJ "should first determine if a claimant's non-exertional limitations

24   significantly limit the range of work permitted by his exertional limitations (internal citations

25   omitted)."  *Id.*

26        The ALJ did exactly as *Desrosiers* requires.  The ALJ found that Claimant had a "severe

27   combination of impairments: deformity of the left fourth and fifth fingers or contracture (Exhibit

28   10F, p. 4) and a psychotic disorder not otherwise specified." (AR 18).   The reference to Exhibit 10F

describes the opinion of an orthopedic consultative examiner, Dr. Juliane Tran, and the further reference to page 4 of that opinion refers to a passage that reads as follows. Under "Diagnoses," Dr. Tran describes:

> ... Previous injury to the left fourth and fifth fingers, probably tendon problems, but no evidence of any carpal tunnel syndrome or cubital tendon syndrome. She does have decreased sensation in the fingers of the left hand, more consistent of a left ulnar nerve sensory deficit. However, she has normal strength. She does have swan neck deformity in the left fourth and fifth fingers, and contracture of the left fourth finger proximal interphalangeal joint. (AR 421).

Under "General Findings," Dr. Tran observed in part, "Examination of the left hand is notable for the left fourth finger having a contracture at the left proximal interphalangeal joint[7] of about 30-45 degrees. Flexion is full."[8] (AR 420). "Left wrist range of motion is full, without complaint of pain" and "[t]here is no joint swelling ... [and] ... no obvious joint deformity." (*Id.*)

Under "Functional Assessment/Medical Source Statement," orthopedist Tran also stated:

> Based on this examination the claimant would be restricted with frequent fingering of the left hand. She would have no restrictions with grasping of either hand and no fingering restrictions of the right hand. She would have no wrist movement restrictions. There are no overhead reaching restrictions.
>
> There are no sitting, standing, walking, bending, stooping, kneeling, or crouching restrictions.
>
> There are not climbing, balancing, or working at heights restrictions. In terms of lifting, the claimant [could occasionally lift and carry] 50 pounds ... and 25 pounds frequently.
>
> The claimant does not need to use an assistive device. (AR 421, 423).

The ALJ assigned great weight to Dr. Tran's opinion. (AR 20). In discussing Dr. Tran's examination and findings in the ALJ's written decision, the ALJ noted:

> ... During the consultative examination in September 2006, claimant exhibited no painful behavior. ... The left hand was noted for left fourth finger having contracture at the left proximal interphalangeal joint.[9] There was a swan neck deformity in the left fourth and third fingers with the

---

[7] This is the joint closest to the palm or back of the hand. *Stedman's Medical Dictionary* 1586 (28th ed. 2006).

[8] This means that Claimant can fully bend the finger toward her palm. *Stedman's Medical Dictionary* 743 (28th ed. 2006).

[9] During testimony elicited by the ALJ at the administrative hearing, claimant reported that she was right-handed. (AR 435).

fourth more affected. There was mild tenderness to palpation over the left third and fourth metacarpophalangeal joints. There was a slight tenderness to palpation over the left wrist at the left radial carpal joint but there was no joint swelling and no obvious joint deformity. Motor strength was normal throughout. Sensation was decreased in the left third, fourth, and fifth fingers to pinprick. Claimant was restricted from frequent fingering of the left hand. (AR 19-20).

Assuming without deciding whether the limited fingering movement in claimant's fourth and fifth fingers of her left hand constituted a non-exertional impairment, the fact remains that the record contains substantial evidence to support the ALJ's apparent conclusion that any such non-exertional limitation was not severe enough to restrict the full range of gainful employment at the medium exertional level.[10] Claimant was right handed and had no manipulative issues with that hand, according to Dr. Tran. (AR 418-426). Dr. Tran made no mention of impairments in the functioning of Claimant's left thumb and index finger nor did Dr. Tran remark on any restrictions in Claimant's ability to grasp with either hand or move either wrist. (*Id.*) Dr. Tran's medical source statement also noted no limitations in Claimant's gross manipulative functioning of her hands. (AR 425). As mentioned earlier, the ALJ gave great weight to this assessment. (AR 20).

In considering whether application of the Medical-Vocational Guidelines would be useful and appropriate, the ALJ recognized:

> If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "non-disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making. (AR 22).

The ALJ also said that "[i]f the claimant had the residual functional capacity to perform the full range of medium work, considering the claimant's age, education, and work experience, a finding of 'not disabled' would be directed by Medical-Vocational Rule 203.29." (*Id.*) However,

_____

[10] The ALJ concluded that claimant retained the residual functional capacity to perform a medium level of exertion limited to simple, repetitive tasks. (AR 21).

the ALJ was aware that non-exertional limitations in Claimant's case could impact the appropriate use of the grids if those limitations had a significant effect on the occupational base of unskilled medium work. (*Id.*) Consequently, the ALJ considered the question of whether Claimant's additional limitations had a significant impact on the occupational base of unskilled medium work. (*Id.*)

> Section 203(a) of the Medical-Vocational Guidelines provides in pertinent part:
>
> > The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work. Approximately 2,500 separate sedentary, light, and medium occupations can be identified, each occupation representing numerous jobs in the national economy which do not require skills or previous experience and which can be performed after a short demonstration or within 30 days." 20 C.F.R., Part 404, Subpart P, Appendix 2.

According to portions of Social Security Rule number 83-14, the bulk of sedentary jobs requires bilateral manual dexterity. Unskilled sedentary work may also involve the fine use of the fingers. Unlike unskilled sedentary work, many unskilled light jobs do not entail the fine use of the fingers. Rather, they require the gross use of hands to grasp, hold, and turn objects. As in light work, most unskilled medium jobs require gross use of the hands to grasp, hold, and turn objects rather than the use of the fingers for fine movements of small objects.

Dr. Tran's assessment of Claimant's orthopedic residual functional capacities does not suggest that the fingering limits of the fourth and fifth fingers of her non-dominant left hand interfere in any significant way with Claimant's bilateral manual dexterity. Claimant retained the capacity to grasp, hold, and reposition objects in both her hands. Claimant had no restrictions in her ability to use the fingers of her dominant hand for fine motor activities. It appears from the record that Claimant also retained the ability to use the thumb and index fingers of her left hand for tasks involving finer movements. Dr. Tran's opinion, to which the ALJ assigned "great weight," supports the conclusion that Claimant could perform the full range of light and medium work.

With the correct legal standards in mind, and relying "greatly" on the opinion of Dr. Tran as well as the reasonable inferences the ALJ may properly have drawn therefrom, the ALJ did not conclude that Claimant's "additional limitations" had a significant effect on the occupational base of unskilled medium work. There is substantial evidence in this record to support the ALJ's evaluation.

Consequently, the ALJ was free to reach a decision at Step 5 of the sequential evaluation process without the use of a vocational expert. *Desrosiers*, 846 F.2d at p. 577; see also SSR. 83-14. In doing so, he did not commit error. The ALJ's finding of "not disabled" was therefore appropriate.

## CONCLUSION AND ORDER

For the reasons discussed above, the Court finds no error in the ALJ's analysis, which was based on proper legal standards and supported by substantial evidence. Accordingly, this Court HEREBY ORDERS that:

1.     Claimant's Social Security complaint, Doc. 2, is DENIED; and

2.     The Clerk of the Court is DIRECTED TO ENTER judgment for Defendant Michael J. Astrue and against Claimant/Plaintiff Sharon Smith, and to close this case.


IT IS SO ORDERED.

Dated:   **March 24, 2009**                                      _____
                                                                        **/s/ Theresa A. Goldner**
                                                                        UNITED STATES MAGISTRATE JUDGE